## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TOSHIBA SAMSUNG STORAGE )
TECHNOLOGY KOREA )
CORPORATION, )
            )
         Plaintiff, )
            )
        v. )           Civil Action No. 15-691-LPS-CJB
            )
LG ELECTRONICS, INC., )
LG ELECTRONICS U.S.A., INC., and )
LG INTERNATIONAL (AMERICA), INC., )
            )
         Defendants. )

## MEMORANDUM ORDER

Before the Court is Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc. and LG

International (America), Inc's. ("Defendants" or "LG") motion to dismiss filed pursuant to

Federal Rule of Civil Procedure 12(b)(1) (the "Motion"). (D.I. 25) With this Motion, LG asserts

that this Court lacks subject matter jurisdiction over the present action because Plaintiff Toshiba

Samsung Storage Technology Korea Corporation ("TSST-K") lacks standing to assert its

infringement claims. For the reasons stated below, the Court DENIES LG's Motion.

## I.    BACKGROUND

### A.    Factual Background

Effective October 1, 2012, TSST-K (or the "Assignee") entered into a "Patent

Assignment" agreement (the "Agreement") with Samsung Electronics Co., Ltd. ("Samsung" or

the "Assignor") with respect to certain patents and pending patent applications (the "Assigned

Patents"), including the four patents-in-suit in this case:  United States Patent Nos. 7,367,037

(the "'037 patent"), 6,721,110 (the "'110 patent"), 6,785,065 (the "'065 patent") and RE43,106

(the "'106 patent"). (D.I. 27, ex. B-1)[1] The Agreement provided, *inter alia*, that in return for certain consideration:

> [Samsung] assigns, transfers, sells and delivers to [TSST-K] all of
> its right, title and interest throughout the world in and to the
> Assigned Patents . . . and all rights, claims and privileges
> pertaining to any of the Assigned Patents, including, without
> limitation, the right to claim priority from the aforementioned
> patents and pending applications, the right to prosecute and
> maintain any of the Assigned Patents and the right to sue and
> recover damages and obtain injunctive and other relief for past,
> present and future infringement or other violation or impairment of
> any of the Assigned Patents.

(*Id.*, ex. B-1 at § 1) The Agreement stated that it was to "be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective permitted successors and assigns." (*Id.*, ex. B-1 at § 4) Next, in Section 9 of the Agreement, it was written that if TSST-K ever decides to "transfer, sell or abandon any of the Assigned Patents," it "shall first notify [Samsung] in writing of its intentions to do so" and that Samsung "shall have the right to acquire, by assignment *and at no charge*, the Assigned Patents." (*Id.*, ex. B-1 at § 9 (emphasis added))

After executing the original Agreement, TSST-K and Samsung twice amended it. The first amendment, also bearing an effective date of October 1, 2012, increased the number of patents transferred to TSST-K under the Agreement (still including the patents-in-suit within that group). (*Id.*, ex. B-2 at § 1) With the second (and final) amendment (the "Second Amendment"), which also bore an October 1, 2012 effective date, TSST-K and Samsung agreed to three additional changes. Those changes were that: (1) the Second Amendment further

---

[1]    When referencing only the four patents at issue in this case, the Court will refer to them as the "patents-in-suit" or the "Asserted Patents." When referencing the group of patents and patent applications subsumed within the scope of the Agreement (which include, but are not limited to, the patents-in-suit), the Court will refer to the "Assigned Patents."

2

increased the scope of patents transferred (while still including the patents-in-suit within that scope); (2) it changed the consideration Samsung received for transfer of the Assigned Patents; and (3) of particular importance here, it added a "Grant Back and Covenant" provision, which was "added as new Section 10" of the Agreement. (*Id.*, ex. B-3 at §§ 1-3) The Grant Back and Covenant section ("Section 10") will be discussed in more detail below.

## B.    Procedural Background

In 2012, LG brought suit against TSST-K in this Court, asserting that TSST-K infringed four of LG's patents (the "LG litigation"). (Civil Action No. 12-1063-LPS) Eventually, TSST-K attempted to raise the instant claims of patent infringement against LG in the LG litigation, by filing them as counterclaims. (D.I. 26 at 1; D.I. 37 at 1) After LG prevailed in its effort to have those counterclaims severed and dismissed without prejudice, (D.I. 26 at 2; D.I. 37 at 2), on August 6, 2015, TSST-K raised those same claims again by including them in the Complaint filed in this action. (D.I. 1)

In that Complaint, TSST-K again alleges that LG infringes, both directly and indirectly, claims of the four patents-in-suit—patents that TSST-K was purportedly assigned through the Agreement. (*Id.* at ¶¶ 32-55; D.I. 27 ex. B-3 at 3) The patents-in-suit all concern, generally, disk players or optical recording and reproducing apparatuses, with each patent being directed to a more specific aspect of such products or method of using such products. ('106 patent, col. 1:28-34 (directed to the optical pickup apparatus); '037 patent, col. 1:24-33 (directed, *inter alia*, to a disk player and turntable); '110 patent, col. 1:15-23 (directed to the actuator of an optical pickup); '065 patent, col. 1:16-24 (also directed the actuator of an optical pickup))

On August 13, 2015, Chief Judge Leonard P. Stark referred this matter to the Court to

3

hear and resolve all matters relating to scheduling, as well as to all motions to dismiss, stay and

transfer venue. (D.I. 5) LG filed the instant Motion on November 25, 2015, (D.I. 25), and the

parties completed their briefing on January 7, 2016, (D.I. 46).[2] In the interim, the parties

consented to the Court's conducting any and all proceedings and entering a final order with

regard to the Motion. (D.I. 34) The Court subsequently heard oral argument on the Motion on

May 2, 2016. (D.I. 67 (hereinafter, "Tr.")) On May 6, 2016, after receiving permission from the

Court to do so, the parties submitted additional authority relevant to issues discussed during oral

argument. (D.I. 69; D.I. 70)

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of

jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(1).[3] Motions brought under Rule

---

[2]      In addition to filing the instant Motion, Defendants also previously filed a motion
seeking to stay the case in favor of *inter partes review* ("IPR") proceedings, (D.I. 12), and, after
the Court denied that motion without prejudice, (D.I. 31), later filed a renewed motion to stay,
(D.I. 62). Subsequently, both parties agreed to a stay of the case as to three of the four patents-
in-suit—all but the '106 patent. The Court entered an Order staying the case as to those three
patents on March 14, 2016. As part of that March 14, 2016 Order, the Court noted that it would
exclude from the stay the resolution of the instant Motion, as both TSST-K and Defendants had
requested. The Court later denied Defendants' renewed motion to stay with regard to the '106
patent on June 17, 2016. (D.I. 79) And most recently, on August 31, 2016, the parties jointly
stipulated (and this Court later ordered) that the entire case should be stayed until all IPRs
relevant to this case and the LG litigation are concluded. (D.I. 90) Again, that stipulation (and
later order) carved out the instant Motion from the stay. (*Id.*)

[3]      As the question of subject matter jurisdiction is not unique to patent law, any
procedural questions relating to that issue would be governed by the law of the regional
Circuit—here the United States Court of Appeals for the Third Circuit. *See Toxgon Corp. v.
BNFL, Inc.*, 312 F.3d 1379, 1380 (Fed. Cir. 2002); *Clouding IP, LLC v. Google, Inc.*, 61 F. Supp.
3d 421, 428 (D. Del. 2014); *cf. Toshiba Corp. v. Wistron Corp.*, 270 F.R.D. 538, 540-41 (C.D.
Cal. 2010).

12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *Clouding IP, LLC v. Google Inc.*, 61 F. Supp. 3d 421, 428 (D. Del. 2014). In reviewing a factual attack like the one at issue here, the Court may consider evidence outside of the pleadings, including affidavits, depositions and testimony, to resolve factual issues bearing on jurisdiction. *See Clouding IP*, 61 F. Supp. 3d at 428; *Abbott Labs. v. Roxane Labs., Inc.*, Civil Action No. 12-457-RGA-CJB, 2013 WL 2322770, at *3 (D. Del. May 28, 2013).[4] In such a circumstance, the presumption of truthfulness does not attach to the allegations in the Complaint. *See Clouding IP*, 61 F. Supp. 3d at 428; *Shahin v. Delaware Dept. of Fin.*, Civ. No. 10-188-LPS, 2012 WL 1133730, at *3 (D. Del. Mar. 30, 2012). Once challenged, the plaintiff bears the burden of persuasion and must establish that subject matter jurisdiction exists. *Clouding IP*, 61 F. Supp. 3d at 428; *Abbott Labs.*, 2013 WL 2322770, at *3.

## B. Standing

"Standing must be present at the time the suit is brought." *Clouding IP*, 61 F. Supp. 3d at 428 (quoting *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)).[5] If a plaintiff lacks standing at that time, the Court lacks subject matter jurisdiction and the case

---

[4]        There is no dispute here that Defendants' attack is a factual one. (D.I. 26 at 5) In determining the extent to which the Agreement transferred rights in the Asserted Patents to TSST-K, the Court will thus consider matters outside of the pleadings (e.g., the Agreement, its amendments and documents evidencing the factual circumstances surrounding the same). *See Gould Elecs.*, 220 F.3d at 176-77.

[5]        With respect to the legal question as to whether a plaintiff has constitutional standing to assert certain patents against a defendant, there it is the law of the United States Court of Appeals for the Federal Circuit that will control. *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010); *Abbott Labs.*, 2013 WL 2322770, at *5 n.6; *cf. Toshiba Corp.*, 270 F.R.D. at 540-41.

5

must be dismissed pursuant to Rule 12(b)(1). *Clouding IP*, 61 F. Supp. 3d at 428.

Standing is comprised of both constitutional and prudential components. As to the constitutional component, which is what is really at issue here, "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).

As to this determination, the Patent Act provides that "[a] patentee shall have remedy by civil action for infringement of his patent." *Sicom Sys.*, 427 F.3d at 976 (quoting 35 U.S.C. § 281). "The term 'patentee' comprises 'not only the patentee to whom the patent was issued but also the successors in title to the patentee'"—that is, the party holding legal title to the patent. *Sicom Sys.*, 427 F.3d at 976 (quoting 35 U.S.C. § 100(d)); *see also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007). Indeed, courts have explained that a patent "is 'a bundle of rights which may be divided and assigned, or retained in whole or part.'" *Clouding IP*, 61 F. Supp. 3d at 429 (quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F. 2d 870, 875 (Fed. Cir. 1991)); *see also* 35 U.S.C. § 261 ("[P]atents, or any interest therein, shall be assignable in law by an instrument in writing.").

When a sufficiently large portion of the "bundle of rights" in a patent is held by one individual, that person is referred to as the owner of the patent, and that individual is permitted to sue for infringement in his own name. *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010). When the patentee transfers to another entity all or a sufficiently large portion of the "bundle of rights" (i.e., "all substantial rights") under the patent, that transfer amounts to an assignment. In such a case, the assignee is then deemed the

6

effective patentee and has constitutional standing to sue for infringement in its own name. *Sicom Sys.*, 427 F.3d at 976; *see also Clouding IP*, 61 F. Supp. 3d at 429; *Abbott Labs.*, 2013 WL 2322770, at \*5.

At any one time, a patent has only one owner (or group of owners) who has "all substantial rights" in that patent. *Alfred E. Mann*, 604 F.3d at 1359-60 & n.2. Thus, it is only the party who "hold[s] all legal rights to the patent as the patentee or assignee of all patent rights" that can sue in their own name alone. *Morrow*, 499 F.3d at 1339 ("When a party holds all rights or all substantial rights, it alone has standing to sue for infringement."); *see also Clouding IP*, 61 F. Supp. 3d at 429. If a plaintiff lacking all substantial rights in the patent brings a patent infringement suit, the suit must either be dismissed, or additional holders of rights under the patent must be joined as parties to the suit (as appropriate given the plaintiff's status as either an exclusive or non-exclusive licensee). *Alfred E. Mann*, 604 F.3d at 1360.

## III.  DISCUSSION

The parties' arguments focus on whether, via the Agreement, TSST-K obtained all substantial rights in the Assigned Patents (including the patents-in-suit) such that TSST-K had standing to bring this action against LG. After first reviewing in more detail what it means to have "all substantial rights" in a patent, the Court will go on to address the parties' specific arguments.

### A.    The "All Substantial Rights" Standard

The Federal Circuit has defined "all substantial rights" as those rights "sufficient for the licensee or assignee to be deemed the effective patentee under [Section] 281." *Sicom Sys.*, 427 F.3d at 976 (internal quotation marks and citation omitted). Whether a transfer of rights does, in

7

fact, amount to the transfer of all substantial rights in a patent "does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Vaupel*, 944 F.2d at 875 (internal quotation marks and citation omitted); *see also EMC Corp. v. Pure Storage, Inc.*, — F. Supp. 3d —, 2016 WL 805814, at *2 (D. Del. Feb. 29, 2016). As each such transaction is unique, a court must diligently attempt to ascertain the "intention of the parties and [to] examine the substance" of the transfer, in order to determine whether all substantial rights in the patent have been conveyed. *Sicom Sys.*, 427 F.3d at 976 (citation omitted). In doing so, "it is helpful to look at what rights have been retained by the grantor, not only what was granted." *Vaupel*, 944 F.2d at 875.

The Federal Circuit has identified a non-exhaustive list of rights a court should consider when undertaking this type of analysis:

> Of course, transfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment . . . . We have also examined the scope of the [transferee's] right to sublicense, the nature of . . . provisions regarding the reversion of rights to the [transferor] following breaches of the . . . agreement, the right of the [transferor] to receive a portion of the recovery in infringement suits brought by the [transferee], the duration of the . . . rights granted to the [transferee], the ability of the [transferor] to supervise and control the [transferee's] activities, the obligation of the [transferor] to continue paying payment maintenance fees, and the nature of any limits on the [transferee's] right to assign its interests in the patent.

*Alfred E. Mann*, 604 F.3d at 1360-61 (citations omitted). Although all of the above factors may be considered, the Federal Circuit has explained that the nature and scope of the transferee's right to bring suit against accused infringers (and, relatedly, the nature and scope of any right to sue purportedly retained by the transferor) is the "most important factor" in the "all substantial rights" calculus. *Id.* at 1361; *see also Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823

8

F.3d 615, 619 (Fed. Cir. 2016); *EMC Corp.*, 2016 WL 805814, at \*2.

## B. Did TSST-K Receive All Substantial Rights in the Asserted Patents?

The Court turns now to the parties' arguments regarding the instant Motion. LG asserts that Samsung retained "the right to practice the patents, the right to license the patents, and the right to re-acquire the patents at no cost[,]" and argues that such rights "are substantial and indicate that the intent of the parties was not to transfer ownership of the Patents-in-Suit to TSST-K." (D.I. 46 at 2; *see also* D.I. 26 at 3) TSST-K disagrees, contending that it has standing to sue LG because it obtained "all of [Samsung's] right, title and interest" in the patents-in-suit, such that it now holds "all substantial rights." (D.I. 37 at 2 (internal quotation marks omitted))

In taking up this issue, the Court will first resolve two threshold disputes regarding the scope and/or effect of the Agreement and its amendments: (1) whether, and to what extent, TSST-K received a right to sue for infringement of the Assigned Patents; and (2) whether a restriction on TSST-K's right to transfer the patents should be a dispositive factor in the "all substantial rights" analysis. The Court will then assess whether TSST-K has met its burden at this stage to show that the Agreement transferred "all substantial rights" to it.

### 1. TSST-K's right to sue

The parties first dispute whether, and to what extent, TSST-K obtained the right to sue for infringement of the Assigned Patents via the Agreement. As to this issue, the vast majority of the parties' attention was focused on Section 10 and its meaning, (D.I. 26 at 9-10; D.I. 37 at 8-15; D.I. 46 at 7-10), and so the Court turns to this section first.

#### a. Section 10 and its meaning

In assessing the Agreement's impact on TSST-K's ability to sue, the parties have a basic

9

disagreement as to the meaning of certain language in Section 10. This dispute implicates principles of contract interpretation.

When interpreting assignment and license agreements relevant to the standing inquiry, courts do so according to the requirements of state law. *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996); *EMC Corp.*, 2016 WL 805814, at *2. Here, the Agreement itself provides that the Republic of Korea's laws "govern all matters that arise out of this Patent Assignment, regardless of the laws that might otherwise govern under applicable principles of choice or conflicts of law thereof." (D.I. 27, ex. B-1 at § 6)  LG, however, asserts that TSST-K waived the right to argue that the Republic of Korea's law controls, by failing to give adequate notice (in its answering brief or otherwise), pursuant to Federal Rule of Civil Procedure 44.1, that it intended to make such an argument. (D.I. 46 at 2 n.3); *see also* Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."). LG argues instead that Delaware law should apply in interpreting the Agreement. *Cf. Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 441 (3d Cir. 1999) ("Where parties fail to [properly raise the issue that foreign law may apply in an action, pursuant to Rule 44.1,] the court will ordinarily apply the forum's law.") (citations omitted).

Here, the Court need not resolve this dispute, in light of TSST-K's acknowledgment that the applicable legal principles would not differ whether the Republic of Korea's law or Delaware's law were applied. (Tr. at 66)[6]  Below, the Court will thus set out Delaware law on contract interpretation, assuming it to mirror the requirements of the Republic of Korea's laws on

---

[6]     Indeed, during oral argument, TSST-K's counsel cited to Delaware law in arguing about how the terms of the Agreement should be understood. (Tr. at 66-67)

the subject.

Under Delaware law, contract interpretation is a question of law, and the court is charged with effectuating the parties' intent. *Cato Capital LLC v. Hemispherx Biopharma, Inc.*, 70 F. Supp. 3d 607, 618 (D. Del. 2014) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)). First, the court must "'review[] the language of the contract to determine if the intent of the parties can be ascertained from the express words chosen by the parties or whether the terms of the contract are ambiguous.'" *Delaware Exp. Shuttle, Inc. v. Older*, No. Civ.A. 19596, 2002 WL 31458243, at *6 (Del. Ch. Oct. 23, 2002) (citation omitted); *see also Cato Capital*, 70 F. Supp. 3d at 618. "When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning . . . ." *Lorillard Tobacco Co.*, 903 A.2d at 739 (internal quotation marks and citation omitted); *see also Cato Capital*, 70 F. Supp. 3d at 618. "Contract terms are held to be clear and unambiguous 'when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'" *Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 256, 259-60 (D. Del. 2015) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

If, however, "the language at issue is 'reasonably or fairly susceptible of different interpretations or may have two or more different meanings[,]'" an ambiguity exists. *Delaware Exp. Shuttle*, 2002 WL 31458243, at *6 (citation omitted). In that instance, the court may consider extrinsic or parol evidence—e.g., "statements and conduct of the parties, business circumstances surrounding the execution of the contract, [or] any course of dealing between the

parties"—to determine the parties' intent regarding the relevant terms. *Id.*; *see also Cato*

*Capital*, 70 F. Supp. 3d at 618. "A contract is not rendered ambiguous simply because the parties

do not agree upon its proper construction." *Cont'l Warranty*, 108 F. Supp. 3d at 260 (internal

quotation marks and citation omitted). Nor will the court "torture contractual terms to impart

ambiguity where ordinary meaning leaves no room for uncertainty." *Rhone-Poulenc*, 616 A.2d at

1196.

With these basic legal principles in mind, the Court turns to the language of Section 10,

which provides that:

> Grant Back and Covenant. Assignee [TSST-K] shall grant
> Assignor [Samsung] a non-exclusive, non-transferable, irrevocable,
> royalty-free, fully paid-up, perpetual, worldwide license under the
> Assigned Patents for their lives to make, have-made, use, sell,
> import, and otherwise dispose of Assignor's products. Assignee
> shall further *covenant not to assert the Assigned Patents against*
> *any Assignor's future licensee*, those entities it owns or controls by
> a majority voting share, and customers or users of the Protected
> Products ("Protected Parties") with respect to such Protected
> Parties' optical disc products, such as, without limitation, optical
> disc drives and optical disc players ("Protected Products")
> provided that and so long as such Protected Parties do not assert
> their patents of any kind whatsoever against Assignee.

(D.I. 27, ex. B-3 at § 3 (italicized emphasis and bracketed material added)) Thus, it appears to be

clear and not disputed that, in Section 10, TSST-K was *covenanting not to sue certain entities* for

patent infringement of the Assigned Patents. The big dispute here is over *which* entities were

meant to have this protection from suit.

LG's position is that Section 10 "unambiguously provides Samsung with the right to

license the Assigned Patents" (i.e., that "any Assignor's future licensee" is a reference to any

entity that *Samsung* licenses in the future to the *Assigned Patents*). (D.I. 46 at 4; *see also* D.I. 26

12

at 9-10) TSST-K disagrees, arguing that the term "any Assignor's future licensee" in Section 10 was intended by the parties (i.e., TSST-K and Samsung) to refer to "one specific company to which Samsung was then contemplating potentially granting a future license to practice Samsung's *own* patents." (D.I. 37 at 5-6 (emphasis in original)) Relatedly, TSST-K argues that "the word 'it' in the phrase 'entities it owns or controls' refers to [this one] 'future licensee,' not to Samsung" and that the phrase "'customers or users of Protected Products' refers to the customers of [this one] 'future licensee' and the users of the 'future licensee's' products." (*Id.* at 6)

Does the language of Section 10 unambiguously mean what LG says it means? The Court concludes that it does not. To the contrary, the language of the Agreement is quite ambiguous.

For one thing, Section 10 does not, on its face, clearly state whether the reference to the "future licensee" in question is meant to refer to an open-ended group of people/entities (as LG suggests) or one particular entity (as TSST-K suggests). Depending on what the words preceding that phrase are, and what those words mean, "future licensee" could be a reference to one person/entity or many people/entities.

Moreover, as to those preceding words, the section utilizes some curious phraseology when it refers to "*any Assignor's* future licensee"—phraseology that heightens the ambiguity as to the dispute at issue here. (D.I. 27, ex. B-3 at § 3 (emphasis added)) As an initial matter, it seems strange to use the phrase "any Assignor's" at all, since that kind of wording would normally suggest that the contract is making reference to multiple different Assignors. And yet here, we know that the Agreement in question relates to only one "Assignor" (Samsung). (*Id.*,

13

ex. B-1 at 1; Tr. at 18)  In any event, the Court acknowledges that—looking only at the wording

of Section 10—it could well be (as LG suggests) that "any Assignor's future licensee" is meant

to be read as if it states "any future licensee of Assignor" or "all of Assignor's future licensees."

But if that were the case, why did the drafters then not use these words?  Indeed, on the other

hand, it seems just as plausible that (once one understands that there is only one

Assignor—Samsung—referred to in the Agreement) the term "any Assignor's" should be read as

"Samsung's."  And if this were so, then the phrase in question here would refer to "[Samsung's]

future licensee"—phrasing that (as TSST-K suggests), sounds a lot more like a reference to one

and only one "future licensee."[7]

> Therefore, on this question regarding the scope of the covenant at issue, Section 10's

language is ambiguous.  As a result, the Court may properly consider extrinsic evidence to

resolve that ambiguity.

> On that score, TSST-K has proffered parol evidence in order to further clarify the

meaning of Section 10 and the covenant described therein.  TSST-K filed declarations from Dr.

Byung Youn Song, its Director of Intellectual Property and Legal, (D.I. 39 ("Song. Decl.") at ¶

---

[7]     It would also seem strange that (as LG asserts) "any Assignor's future licensee"
was meant to refer to an entity/group of entities that would be licensing *the Assigned Patents* (as
opposed to some other patents or technology).  In its briefing, LG argued that, pursuant to
Section 10, "Samsung retained a right to . . . grant licenses to the TSST-K patents-in-suit[,]" that
Samsung could "continue to grant licenses under the patents to anyone it wishes without TSST-K
having any say in the matter" and that Samsung "could license everyone in the world" if it
wanted to.  (D.I. 26 at 8-9; *see also* D.I. 46 at 4 ("Thus, it is undisputed that the plain language of
Section 10 . . . unambiguously provides Samsung with the right to license the Assigned
Patents."); *id.* at 10)  Were LG's position correct, the language in Section 10's first sentence,
which notes that Samsung is receiving a "non-transferable" license to the Assigned Patents,
would make no sense.  Relatedly, were Section 10 said to permit Samsung to sub-license the
Assigned Patents, there would seem to be no need for TSST-K to grant (as it clearly does in
Section 10) a covenant not to sue certain entities related to Samsung.  (Tr. at 74)

14

1), and Jay Shim, the Senior Vice President of Intellectual Property at Samsung, (D.I. 38 ("Shim Decl.") at ¶ 1).[8] Both Dr. Song and Mr. Shim state that their respective companies, at the time the Agreement was amended to include Section 10, understood the phrase "[any] Assignor's future licensee" as a reference "only to *one specific company* to which Samsung was then contemplating potentially granting a future license to practice Samsung's *own patents*." (Song Decl. at ¶ 4; Shim Decl. at ¶ 4 (emphasis added)) The declarations further provide that the word "it" in the phrase "entities it owns or controls" was indeed a reference to the "future licensee," not to Samsung. (Song Decl. at ¶ 5; Shim Decl. at ¶ 5) Similarly, the two declarants state that the phrase "the customers or users of the Protected Products" is a reference to customers of the future licensee and users of the future licensee's products—not to Samsung's customers or to the users of Samsung's products. (Song Decl. at ¶ 6; Shim Decl. at ¶ 6)[9]

---

[8]     LG also contends that consideration of TSST-K's parol evidence is improper because the Agreement contains an integration clause. (D.I. 46 at 4-5; *see also* D.I. 27, ex. B-1 at § 8) "Where the parties have made a contract and have expressed it in writing to which they both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, . . . will not be admitted for the purpose of varying or contradicting the writing." *Scott v. Land Lords, Inc.*, 616 A.2d 1214, 1992 WL 276429, at *3 (Del. Sept. 22, 1992) (quoting *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 315 (Del. Super. 1973)). If, however, a court "seeks aid in its interpretation of ambiguous terms in a written contract," parol evidence may be considered. *Engle v. Oney*, Civ. A. No. 1249, 1989 WL 44045, at *2 (Del. Ch. Apr. 25, 1989); *see also Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, Civil Action No. 8520-VCG, 2014 WL 4840443, at *14 n.111 (Del. Ch. Sept. 30, 2014); (Tr. at 16-17). As noted above, the language at issue in Section 10 is ambiguous and the Court is thus turning here to extrinsic evidence to help resolve that ambiguity. As such, under Delaware law, the integration clause is not a barrier to the Court's consideration of TSST-K's proffered declarations.

[9]     At oral argument, LG raised (for the first time) another argument as to why consideration of TSST-K's declarations was impermissible: that the declarations do not meet the requirements of 28 U.S.C. § 1746 ("Section 1746"). (Tr. at 27-28) Section 1746 requires declarations executed outside of the United States (like Mr. Song's and Mr. Shim's declarations, which were executed in the Republic of Korea) to state that the person "declare[s] . . . under penalty of perjury *under the laws of the United States of America* that the foregoing is true and correct.'" 28 U.S.C. § 1746 (emphasis added). Mr. Song's and Mr. Shim's declarations,

however, stated only that they "declare[d] under penalty of perjury that the foregoing is true and correct." (D.I. 38 at 3; D.I. 39 at 3; *see also* Tr. at 28)  Because LG raised this argument for the first time after briefing was completed, but also because the declarations are important to the Court's consideration of the Motion, the Court agreed to consider LG's argument while also permitting TSST-K the opportunity to submit a supplemental letter brief to address the Section 1746 issue. (Tr. at 83)  TSST-K did so, and also included along with its submission a revised declaration from Mr. Song that now tracks the exact language set out in Section 1746 for foreign declarations. (D.I. 70 & ex. A).

Courts have disagreed on whether declarations like Mr. Song's original declaration and Mr. Shim's declaration are violative of Section 1746.  Some courts conclude that because Section 1746 requires only that a declaration be "in substantially" the form provided by the statute, declarations like those at issue here meet the statute's requirements. *See, e.g., LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (accepting a foreign declaration despite its failure to declare "under the laws of the United States of America" or to state that the content was "true and correct"); *Gabriel v. Superstation Media, Inc.*, Civil Action No. 13-12787-NMG, 2015 WL 1648723, at *3 (D. Mass. Apr. 14, 2015) (finding a foreign declaration to be sufficient where it stated it was "'[s]igned under the pains and penalties of perjury'"); *United States v. West*, No. 08 CR 669, 2010 WL 3951941, at *3 (N.D. Ill. Oct. 4, 2010) (finding a foreign declaration that omitted "under the laws of the United States of America" but that otherwise complied with Section 1746's requirements to be substantially compliant with the statute); *Ticketreserve, Inc. v. viagogo, Inc.*, 656 F. Supp. 2d 775, 777 n.1 (N.D. Ill. 2009) (same).  Other courts have disagreed, finding that the omission of the phrase "under the laws of the United States of America" rendered the declaration incompatible with the statute's requirements. *See, e.g. Ostrow v. GlobeCast Am. Inc.*, No. 10-61348-CIV, 2011 WL 4853568, at *4 n.4 (S.D. Fla. Oct. 13, 2011); *cf. Sterling Fifth Assocs. v. Carpentile Corp., Inc.*, No. 03 Civ.6569(HB), 2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) (declining to consider a foreign declaration where it failed to contain this language and failed to state that its contents were "true and correct").

The Court here finds Mr. Song's original declaration and Mr. Shim's declaration to be substantially compliant with Section 1746's requirements, and will consider their contents.  It does so in part because it agrees with the rationales expressed in the line of cases above that do the same.  Helpful too to this conclusion is the fact that here, the declarations begin with a reproduction of this (United States-based) case's caption—providing further indication that the declarants were aware that their statements were made to a United States court and pursuant to the laws of the United States. *See Powell v. Profile Design LLC*, 838 F. Supp. 2d 535, 540 (S.D. Tex. 2012) (concluding the declaration was "substantially" in the form required by Section 1746 where the person declared "'under penalty of perjury that the foregoing is true and correct[]'" and appeared to otherwise understand that he was making his declaration under the laws of the United States because the document's heading "specified that the case would be based in the United States").  Moreover, the Court is also comforted in this conclusion by: (1) the fact that

16

Because these declarations are clear as to the meaning of the key disputed term, and because they come from representatives of both parties to the Agreement, the Court finds that they serve to wipe away the ambiguity referenced above. Therefore, based on the evidence before it, the Court reads Section 10 to have the following meaning: (1) Samsung received a non-exclusive license to the Assigned Patents (including the patents-in-suit) with the rights and limitations explicitly identified in the first sentence of Section 10; (2) TSST-K covenanted not to assert the Assigned Patents against one company—a company to which, at the time Section 10 was executed, Samsung was then considering granting a license under its *own* patents; and (3) this covenant not to sue also extended to the companies that this one "future licensee" owns or controls, as well as to customers of this future licensee and users of this future licensee's products in a field of use.

### b. The extent of TSST-K's right to sue

With this understanding in mind, the Court turns to whether (and to what extent) the Agreement transferred the right to sue for infringement of the patents-in-suit to TSST-K.

To begin with, the Agreement makes clear that it is TSST-K, and TSST-K alone, that has the exclusive right to bring suit. Section 1 transferred to TSST-K "all rights . . . pertaining to any of the Assigned Patents, including, without limitation, . . . *the right to sue and recover damages and obtain injunctive and other relief for past, present and future infringement* . . . of the Assigned Patents." (D.I. 27, ex. B-1 at § 1 (emphasis added)) The Agreement does not state that

---

Mr. Song has now submitted a declaration revised only to include language mirroring that set out in Section 1746; and (2) although Mr. Shim has not submitted a revised declaration, the substantive content of his declaration (regarding the contract interpretation issue set out above) is very similar to that included in Mr. Song's revised declaration.

17

Samsung retained any right to sue. Nor did it carve out, for example, any ability for Samsung to *directly* impact TSST-K's ability to file suit or its ability to control any such litigation once filed.

Although TSST-K retains the sole right to sue on the patents-in-suit, the existence of the covenant not to sue, referenced above, obviously places some potential limit on the group of defendants who might be the target of such a suit. LG argues that this reality renders TSST-K's right to sue illusory. More specifically, LG contends that even if the term "future licensee" was a reference to only one entity (as the Court has concluded it is), Federal Circuit case law indicates that TSST-K lacks standing because it is possible that, *inter alia*, LG itself could be (either now or in the future) a customer or user of that licensee's Protected Products (and thus obtain the benefit of the covenant granted in the Agreement). (Tr. at 21-23, 25-26, 77) In support of this argument, LG cited to the Federal Circuit's analysis in *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010). (*Id.* at 21-23)

In that case, plaintiff WiAV Solutions LLC ("WiAV") had brought suit for infringement of nine patents against various defendants; of these nine patents, WiAV owned two and was the "purported exclusive licensee in a specific field of use" of the remaining seven (the "Mindspeed Patents"). *WiAV*, 631 F.3d at 1259-60. In addition to the plaintiff's purported exclusive license, six other third-party entities held licensing rights in the Mindspeed Patents. *Id.* at 1260. The district court concluded that WiAV lacked constitutional standing to enforce the Mindspeed Patents against the defendants "because several third parties [had] a limited right to license the patents in WiAV's alleged exclusive field of use." *Id.*

On appeal, the sole issue before the Federal Circuit was whether WiAV had constitutional standing to bring suit against the defendants for infringement of the Mindspeed Patents. The

18

*WiAV* Court explained that a plaintiff does not lack constitutional standing "merely because its license is subject . . . to future licenses that may be granted only to parties other than the accused." *Id.* at 1267. Ultimately, the *WiAV* Court stated "[i]f the accused neither possesses nor can obtain such a license," the plaintiff's "exclusionary rights with respect to that accused party are violated by any acts of infringement that such party is alleged to have committed, and the injury predicate to constitutional standing is met." *Id.*

With these principles in mind, the Federal Circuit found the "key question" to be not whether the plaintiff had "the right to exclude *all* others from practicing the patent[,]" but whether it had "the right under the patents to exclude *the Defendants* from engaging in the alleged infringing activity . . . ." *Id.* (emphasis in original). In assessing this question, the Federal Circuit noted that it might have been theoretically possible for certain of WiAV's third-party licensees to sublicense the patents-in-suit to the defendants. For example, it noted that one third-party licensee, Qualcomm Inc. ("Qualcomm"), was permitted to license the relevant patents to its "'Affiliates[,]'" and that defendants had argued that certain circumstances might possibly occur in the future that could render them Qualcomm "Affiliates." *Id.* Yet the *WiAV* Court noted that at the motion to dismiss stage, "WiAV need only present a sufficient allegation of legal injury[,]" and that because "there [was] no argument or evidence [before the Court] suggesting that the Defendants [were] Qualcomm Affiliates[,]" there was no basis to conclude that WiAV lacked standing. *Id.* (citing *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)).

Here, the answer to whether LG is now (or possibly could be in the future) a beneficiary of the covenant at issue was made a bit more opaque by the fact that the Shin and Song declarations do not actually name the entity that was expected to be Samsung's "future licensee"

19

at the time of the adoption of Section 10. (D.I. 46 at 5 n.5; Tr. at 15) Nor was TSST-K's counsel able to identify that entity when asked by the Court at oral argument; counsel noted only that the information is not of record. (Tr. at 67-68) It appears undisputed, at least, that this "future licensee" was not LG, and that the "future licensee" does not currently own or control LG. But the Court has little information with which to gauge how likely it is that LG could at some future point be owned or controlled by this "future licensee" or whether LG is or could become a customer of the "future licensee" or user of that entity's products in the relevant field of use.[10]

Nevertheless, it appears that LG could not have asserted the benefit of the covenant in Section 10 at the time of the instant suit (nor could it in the future) for a different reason. Section 10 precludes any entity from asserting the benefit of the covenant described therein if that entity "assert[s its] patents of any kind whatsoever against [TSST-K]." (D.I. 27, ex. B-3 at § 3) In 2012, LG brought the LG litigation against TSST-K in this Court, asserting that TSST-K infringed four of LG's patents. (*See* Civil Action No. 12-1063-LPS; *see also* D.I. 37 at 14 n.4).

In light of the fact that TSST-K has the right to exclude LG from engaging in infringement of the patents-in-suit, the Court finds that nothing in Section 10 serves as an absolute bar to TSST-K's claim of standing here.

## 2. TSST-K's right to assign or transfer

The parties' second dispute relates to Section 9 of the Agreement.[11] LG claims that in

---

[10] In light of its conclusion below as to LG's inability to assert the benefit of the covenant, the Court does not believe that TSST-K's failure to identify the "future licensee" renders the Court unable to decide the Motion. Presumably, were the case to move forward in the future, the identity of that licensee could be easily confirmed if necessary.

[11] That section, entitled "Future Sale or Transfer," provides in full that: "If [TSST-K] decides to transfer, sell or abandon any of the Assigned Patents [it] shall first notify [Samsung] in writing of its intentions to do so, and [Samsung] shall have the right to acquire, by

light of Section 9, "the right to transfer [the patents] was not conveyed" to TSST-K, because in that section Samsung retained "a right of first refusal if TSST-K decides to transfer, sell or abandon any of the Assigned Patents[,]" (D.I. 26 at 8), and this "substantially interferes with TSST-K's right to transfer the patents" because Samsung may re-acquire the Assigned Patents "by assignment *and at no charge*[,]" (D.I. 46 at 8 (emphasis in original)). TSST-K, for its part, acknowledges that Samsung received "a reversionary right of first refusal to reacquire the patents upon the occurrence of the specified conditions[,]" but argues that this right does not "significantly restrict" TSST-K's own exclusionary rights and does not "deprive[] TSST-K of standing." (D.I. 37 at 3-4, 15, 17-18)

Here, the Court first needs to set out how the Agreement metes out rights affecting transfer of the Assigned Patents. Then it must determine whether Section 9's restrictions are so significant that—as LG argues—that the Court "need look no further to determine that Samsung reserved substantial rights under the Agreement." (D.I. 26 at 8)

As to the first task, on the one hand, there is no doubt that the Agreement provides TSST-K with the sole right to assign or transfer the Assigned Patents. In Section 1, Samsung transferred to TSST-K "all . . . right, title and interest throughout the world in and to the Assigned Patents" and "all rights, claims and privileges pertaining to . . . the Assigned Patents[.]" (D.I. 27, ex. B-1 at § 1) And Section 4 of the Agreement, titled "Successors and Assigns[,]" clearly contemplates that there may be future "assigns" (i.e., an entity that TSST-K assigns one or more of the patents to). (*Id.*, ex. B-1 at § 4 ("The Patent Assignment will be binding upon . . . the

assignment and at no charge, the Assigned Patents upon written notice to [TSST-K], at which point the parties shall execute a patent assignment in the form provided by [Samsung]." (D.I. 27, ex. B-1 at § 9)

21

parties and their respective permitted successors and assigns.")) Moreover, as TSST-K argues, (D.I. 37 at 15), Section 9 itself is predicated on the idea that TSST-K has the right to "transfer [or] sell" the Assigned Patents. (D.I. 27, ex. B-1 at § 9; *see also* D.I. 37 at 15)

On the other hand, Section 9's language does provide for a real and meaningful restriction upon TSST-K's right to transfer: if TSST-K wishes to transfer or sell any of the Assigned Patents, Section 9 requires that it must first advise Samsung of that fact and give Samsung the right to acquire the patent(s) at no charge. (D.I. 27, ex. B-1 at § 9); *see New Medium Techs. LLC v. Barco N.V.*, 644 F. Supp. 2d 1049, 1054 (N.D. Ill. 2007) (finding that a "'right of first refusal'" term "further restrict[ed] Plaintiffs' ability to freely transfer their rights" where the term gave the licensors "the absolute ability to prevent transfer of [licensees'] rights to third parties" by allowing them to buy back the rights they conveyed to Plaintiffs for "as little as the amount of the offer received by Plaintiffs, and in any event, for no more than $50,000").

As to the second task, the Court concludes that although this restriction on transfer is not insignificant, its existence does not end the standing inquiry. The Court comes to this conclusion for a few reasons.

As an initial matter, the terms of the Agreement *do* allow for TSST-K to actually transfer the patents at issue in some number of scenarios. That is, so long as Samsung declines to exercise its right to acquire the patents, TSST-K then could proceed with a transfer or sale. While it might at first seem that there is little downside to Samsung in blocking transfer (in that Samsung would not need to pay anything to reacquire the patents in such a situation), (D.I. 46 at 8), TSST-K has suggested that Samsung might be deterred from doing so due to the requirement that it would thereafter have to pay substantial maintenance fees on the patents. (Tr. at 50-51)

22

Whatever the "odds" are that TSST-K's future desires to transfer the Assigned Patents might be frustrated by Samsung, at a minimum, this is not a situation where TSST-K is entirely prohibited from transferring the patents.[12]

Moreover (and relatedly), this is not a case where at some determined point, TSST-K *must* offer up its rights in the Assigned Patents to LG (or any other entity) or *must* defend those rights in order to stave off their transfer to another entity. The predicate to Samsung's ability to exercise its right of first refusal is that TSST-K must decide, in the first instance, to transfer, sell or abandon the Assigned Patents. This requirement not only gives TSST-K control over whether Samsung's right of first refusal is triggered (e.g., TSST-K could simply never seek to transfer any of the Assigned Patents), but it also relieves TSST-K from any affirmative duty to defend against Samsung's right to reacquire the patent. *Cf. Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191-92 (Fed. Cir. 2007) (concluding that, although not dispositive, the licensor's "power to terminate the agreement and end all of [the licensee's] rights in the patent" if the licensee failed "to meet certain specified benchmarks in its efforts to exploit the patent" was an indication that the licensor retained a "significant ownership interest in the patent"); *Sherman & Assocs., Inc. v. Oxford Instruments, PLC*, No. C 11-00827 CRB, 2012 WL 78462, at \*6 (N.D. Cal. Jan. 10, 2012) (treating a restriction as "significant," but not dispositive, where the licensee's rights would "automatically terminate" were the licensee to cease operating, merge, be acquired or go

---

[12]     Indeed, in a case where a license agreement *did* forbid in all instances a licensee from assigning its rights under a patent, a court still found the licensee to have all substantial rights to the patent, because the licensee retained "otherwise unfettered rights to use the [p]atents and to sue and settle claims without [the licensor's] supervision[.]" *PerkinElmer Health Scis., Inc. v. Agilent Techs., Inc.*, 932 F. Supp. 2d 207, 212 (D. Mass. 2013) (concluding that the plaintiff had obtained all substantial rights even through the license agreement "forb[ade the plaintiff] from assigning its rights under the patent").

23

through liquidation); *VirnetX, Inc. v. Microsoft Corp.*, No. 6:07 CV 80, 2008 WL 8894682, at \*6 (E.D. Tex. June 4, 2008) (concluding that transferor's reversionary right in the patents in question, which would trigger if the transferee/litigant did not pay the transferor a fixed amount by a certain date, while "not dispositive[,]" indicated that the transferor retained an interest in the patents).[13]

Additionally, TSST-K has the ability to sub-license the Assigned Patents free from Section 9's restriction on transfer. (D.I. 27, ex. B-1 at § 1; *see also* D.I. 37 at 9-10) Courts have found that even where an transferee holding rights in the patent must obtain the transferor's consent to assign patent rights (a circumstance akin to the rights Section 9 affords to Samsung), that does not constitute an unduly significant restriction on patent rights, particularly where the transferee maintains the ability to grant licenses to the patent. *See Morrow*, 499 F.3d at 1342; *Syngenta Seeds, Inc. v. Monsanto Co.*, No. Civ.04-228-SLR, 2005 WL 984362, at \*4 (D. Del. Mar. 18, 2005).

In light of these considerations, the Court finds no basis to treat Samsung's right of first refusal as a dispositive limitation in the "all substantial rights" inquiry. It is a limitation of rights,

---

[13]    In some cases where a litigant would lose their entire right to a patent upon the occurrence of a future event outside of the litigant's control, courts have nevertheless found the litigant to have been conferred all substantial rights in the patent. *See Vaupel*, 944 F.2d at 875 (concluding the plaintiffs had standing despite asserting a patent subject to "a reversionary right . . . in the event of bankruptcy or termination of production by Vaupel"); *cf. Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1378-79 (Fed. Cir. 2000) (concluding that even the existence of a termination clause—which gave the licensor total discretion to automatically terminate the licensee's rights in deciding whether to renew the agreement—did not in itself *require* the licensor to be joined in that action, where the agreement did not specify a "'hard'" termination date beyond which the license cannot be renewed). Again, here TSST-K is not subject to such a condition pursuant to the Agreement. But the point is that even if it were, that fact alone would not be dispositive as to the "all substantial rights" inquiry.

24

to be sure. But it should simply be viewed as one of many factors that go into the Court's ultimate assessment. *Cf. Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) (recognizing "that limits on the assignment of rights *are a factor* weighing in favor of finding a transfer of fewer than all substantial rights") (emphasis added).

### 3. The Agreement Transferred All Substantial Rights in the Assigned Patents to TSST-K

Having resolved the two disputes set out above, the Court now turns to the ultimate question here—whether the Agreement transferred all substantial rights in the Assigned Patents to TSST-K. It concludes that, although the issue is not an easy one, all substantial rights were transferred.

First (and of great significance), the "most important consideration" for purposes of the "all substantial rights" analysis—what entity retains the right to sue on the patents at issue—cuts in favor of TSST-K. *See Alfred E. Mann*, 604 F.3d at 1361; *see also Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006). As noted above, the Agreement granted TSST-K the exclusive "right to sue and recover damages and obtain injunctive and other relief for past, present and future infringement or other violation or impairment of any of the Assigned Patents." (D.I. 27, ex. B-1 at § 1) Therefore as the "policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer[,]" that policy will not be "undercut here because the right to sue rest[s] solely with" TSST-K. *Vaupel*, 944 F.2d at 875-76.

Of course, as was noted in Section III.B.1, TSST-K's right to sue is potentially cabined a bit by the covenant provided in Section 10. But the scope of that covenant (in light of the Court's determination above), is far less broad than what LG was suggesting. And taking into

account that TSST-K otherwise retains control over the process of bringing suit—i.e., to "decide whether or not to bring suit, when to bring suit, where to bring suit, what claims to assert, what damages to seek, whether to seek injunctive relief, whether to settle the litigation, and the terms on which the litigation will be settled"—then even taking into account Section 10's covenant, TSST-K's right to sue seems largely "unfettered." *Alfred E. Mann*, 604 F.3d at 1362; *cf. MobileMedia Ideas, LLC v. Apple Inc.*, 885 F. Supp. 2d 700, 708-09 (D. Del. 2012) (denying a motion to dismiss for lack of standing where, *inter alia*, a third party had the right to retain and oversee litigation counsel, handle and resolve all of the plaintiff's legal disputes, identify prospective licensees and negotiate licenses, and collect all royalties owed to the plaintiff, but the third party otherwise never held legal title or any license to the patent, such that it was the plaintiff—not the third party—that had the "'right' to sue"); *TV Guide Online, Inc. v. Tribune Media Servs.*, Civ. No. 05-725-SLR/LPS, 2008 WL 979538, at *4 (D. Del. Mar. 26, 2008) (concluding that at least 19 pre-existing, nonexclusive licenses did not defeat the plaintiff's standing). This is especially so where there is no indication in the record that the covenant has impacted or could in the future impact TSST-K's ability to sue LG. *See supra* Section III.B.1.b. Therefore, this "particularly dispositive" right to sue weighs heavily in favor of finding a transfer of "all substantial rights." *Vaupel*, 944 F.2d at 875; *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1031-32 (Fed. Cir. 2015) (concluding that the transfer of, *inter alia*, "the exclusive past, present, and future rights to sue and recover for infringement . . . strongly weigh[ed] in favor of finding" that the plaintiff alone had standing).

Second, the Court is also swayed by the apparent intent of the parties in drafting the Agreement, as reflected by some of the wording in the document. *See AsymmetRx, Inc. v.*

26

*Biocare Med., LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009) ("To determine whether an assignment of patent rights was made, we must 'examine whether the agreement transferred all substantial rights' to the patents and 'whether the surrounding circumstances indicated an intent to do so.'" (quoting *Vaupel*, 944 F.2d at 874)). Of course, the legal effect of an agreement like this matters more than does its title, or the presence of a few stray words here or there. But it is at least worth noting that in its title (i.e., "Patent Assignment") and as to its unequivocal statement regarding the transfer of all "right, title and interest" and "all rights, claims and privileges" relating to the Assigned Patents, (D.I. 27, ex. B-1 at § 1), the Agreement does use broad language in describing what rights were intended to be conveyed to TSST-K. *See MobileMedia Ideas*, 885 F. Supp. 2d at 708 ("Sony, Nokia and Tagivan, undoubtedly aware of the relevant caselaw, structured the instant transactions such that MMI had 'the entire right, title and interest' in the patents-in-suit. 'A transfer of the "entire interest" of a patentee is well known to mean a full assignment of the patent—i.e, transfer of title.'") (citations omitted).

Third, although Section 9 of the Agreement places limits on TSST-K's right to transfer the Assigned Patents, those limits are not so stringent as to suggest a finding in LG's favor. As discussed in Section III.B.2, Samsung's right of first refusal allows it only the *possibility* of re-acquiring the Assigned Patents, only if *TSST-K decides* to transfer, sell or abandon the patents (and thus, trigger the risk that Samsung will choose to re-acquire the patents at no immediate cost). *See Aspex Eyewear*, 434 F.3d at 1342-43 (distinguishing a more severe reversion limitation—reversion upon a definite termination date (e.g., a fixed period of years)—from those cases where "the term of the [assignment of patent rights] existed potentially for the life of the respective patents, and it was presumable that the transferred patent would never return to the

27

assignor").[14] Moreover, the Agreement provides TSST-K the broad ability to license the

Assigned Patents, or otherwise monetize them (e.g., through commercial development or

enforcement efforts). This "important consideration" in the "all substantial rights" analysis,

*Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1380 (Fed. Cir. 2000), also serves to lessen

the severity of Section 9's limitation. *Cf. PerkinElmer Health Scis.*, 932 F. Supp. 2d at 212

(concluding that a complete prohibition on the assignment of the patents was "circumscribed" by

the transferee's "ability to sublicense its rights and monetize its ownership interests in the

patents"); *Syngenta Seeds*, 2005 WL 984362, at *4.

 Fourth, it is important that the Agreement provides TSST-K other rights indicative of

ownership. For example, TSST-K enjoys exclusive rights to all proceeds and other benefits

obtained from its enforcement actions, and the right to make, use and sell products or services

under the Assigned Patents. *See Alfred E. Mann*, 604 F.3d at 1360-61.

 Taking all of these considerations into account, and based on the record before it, the

Court concludes that the Agreement did transfer from Samsung to TSST-K all substantial rights

in the Assigned Patents. *Cf. Vaupel*, 944 F.2d at 875 (finding that licensee had standing to sue

even when the grantor retained "1) a veto right on sublicensing by [the licensee]; 2) the right to

obtain patents on the invention in other countries; 3) a reversionary right to the patent in the

---

[14] *Cf. Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1346 (Fed. Cir. 2014)
(concluding that a reversionary interest did not amount to ownership of the patent where the
agreement was subject to a "rolling renewal cycle that [could] extend to the end of the patent's
term"), *vacated on other grounds*, 135 S. Ct. 1846 (2015); *Pliant Corp. v. MSC Mktg. & Tech.,
Inc.*, 355 F. Supp. 2d 926, 930-31 (N.D. Ill. 2005) (concluding that a party was not
"indispensable" under Federal Rule of Civil Procedure 19, despite its apparent ability to invoke a
contingent reversionary right to take the asserted patent back, where "[t]he Federal Circuit has
adopted a clear principle that reversionary interests do not prevent the assignee from suing as
patentee").

event of bankruptcy or termination of production by [the licensee]; and 4) a right to receive infringement damages."); *PerkinElmer Health Scis.*, 932 F. Supp. 2d at 211-12 (denying a motion to dismiss for lack of standing, despite the fact that (1) a third-party retained (i) a secondary right to litigate the patents if the plaintiff declined to do so; (ii) the right to participate through counsel in any plaintiff-initiated litigation; (iii) the right to make, use and practice the patented material for non-commercial purposes; and (iv) the right to terminate the agreement if the plaintiff failed to make required payments or became insolvent; and (2) the plaintiff was otherwise flatly prohibited from "assigning its rights under the patent").[15] Thus, TSST-K has met its burden and has sufficiently demonstrated that it has standing to assert the patents-in-suit against LG.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES LG's Motion.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **September 27, 2016** for review by the Court, along with a motion for redaction that includes a detailed explanation as to why disclosure of any proposed

---

[15]     *See also Azure Networks*, 771 F.3d at 1343-47 (finding the plaintiff had all substantial rights in the asserted patent—despite the third-party licensor's right to receive a portion of enforcement proceeds, its non-exclusive right to practice the patent, its mutual right to terminate the license if the other party failed to substantially perform or otherwise materially breached the agreement, and its reversionary right to ownership of the patent triggering two years before the patent expired (with an option to renew the agreement for those two years)—where the plaintiff nevertheless acquired "the right to enforce, to license, to control the licensing and litigation, to sublicense, to [effectively] practice exclusively, and to maintain the patent").

redacted material would "work a clearly defined and serious injury to the party seeking closure."

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and

citation omitted). The Court will subsequently issue a publicly-available version of its

Memorandum Order.

Dated: September 20, 2016

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

30